UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 11-10414-MLW |
| | ) | |
| KENNETH KELLEY | ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Defendant Kenneth Kelley respectfully submits this memorandum to assist the Court in sentencing.

On October 28, 2011, defendant was arrested on related state charges and held. On January 18, 2012, he was taken into federal custody and detained to the present.

On October 12, 2012, he pleaded guilty in this Court to a two-count indictment charging bank robbery in violation of 18 U.S.C. § 2113(a).

A. The Applicable Sentencing Standard

Under 18 U.S.C. § 3553(a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2).  This is an "individualized assessment based on the facts presented." Gall v. United States 128 S.Ct. 586, 596 (2007).  Courts are permitted to consider whether a sentencing guideline is unreasonably high. Kimbrough v. United States, supra; United States v. Boardman, 528 F.3d 86 (1st Cir. 2008); United States v. Martin, 520 F.3d 87, 93-94 (1st Cir. 2008).

The First Circuit elaborated on the meaning and breadth of the so-called parsimony principle in <u>United States v. Yonathan Rodriguez</u>, 527 F.3d 221 (1st Cir. 2008). The court stressed that the Supreme Court ruling in <u>Kimbrough</u> requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." <u>Id</u>. at 228. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." <u>Id</u>. (emphasis added).

B. <u>Offense Conduct</u>

On September 16, 2011, defendant entered the RTN Federal Credit Union in Tewksbury, wearing a Patriots hat and sunglasses. He approached a teller and displayed a note reading, in substance, "Please give me the cash -- no dye packs -- loose change only." The teller gave him $1,315 and he left the credit union.

Hours earlier, he had entered a nearby Chase Bank in Tewksbury. As he entered the bank, he was asked to remove his hat. He did so, and then left the bank.

On October 26, 2011, he entered a Citizens Bank branch in Woburn, wearing a baseball cap. Bank employees requested that he

remove the hat. He did so and then left the bank without approaching a teller.  About ½ hour later, he entered a second Woburn bank, the Winchester Savings Bank, wearing the same Red Sox hat. He approached a teller, holding a note demanding 100's, 50's, 20's and 10's. The teller gave him $7,100 and he left the bank.

When he was arrested days later, he had heroin in his pocket.

C.  Relevant Guideline

Under USSG §2B3.1, the base offense level is 20, with an additional 2 levels under § 2B3.1(b)(1) (property of a financial institution), with an additional 2 added under the grouping rules (USSG § 3D1.2 – 2 banks), less 3 for acceptance. The resulting Total Offense Level is 21.  His CHC is VI, with a resulting range of 77-96 months.

D.  History And Characteristics Of Defendant

Defendant is 34.  He grew up in an intact family, and graduated from the Medford High School in 1997.  But his early years were marred by drug abuse, and his record shows a tightly spaced series of assaultive and/or property destruction crimes up to age 20.  The sequence of convictions was as follows:

```
Age   Offense
15    ABDW (Pool Stick), Somerville Juvenile Court
16    Mal. Dest. of Prop., Somerville District Court
18    ABDW, Malden District Court, 6 mo. cmtd.
18    ABDW, Somerville Dist. Ct., prob. viol.
19    Mal. Dest. of Prop., Som. Dist., prob. revoked, 5 mo.
```

```
                cmtd.
     19    Trespassing,  Woburn District Ct.
     20    A&B, Malden Dist. Ct., 2 yrs. HC
     20    ABDW, Malden Dist. Ct., 2 yrs. concurrent
     20    A&B, Malden Dist. Ct., 2 yrs. concurrent
```

This series of crimes concluded at age 20 (in 1999) with a committed jail sentence.

Upon his release, he significantly changed his habits and life. He was influenced by his mother, who at the time suffered from cancer and who was in rapid health decline culminating in her death on June 29, 2001. Kelley, without benefit of drug treatment, stopped his drug use. He found and held several jobs beginning with employment at a heating and cooling company, Ranco Enterprises of Medford, where he worked from June 2000 to February 2001. His employment was interrupted for a brief time in February 2001 when he was held on a parole matter which was resolved and dismissed. He found work again in June 2000 with Multimedia Technologies, then in Woburn, until November 2003, where he worked installing dedicated music systems into homes. He also worked at Karas and Karas Glass Co, Inc., in South Boston from March to July 2003. He became apprenticed to a trade union, Painters and Allied Trades 1044, Roslindale. Throughout this period, he was drug free. Unfortunately, he did not have the benefit of formal drug treatment, and thus had none of the insights and trained responses to help guard against relapse.

He relapsed, as too typically happens, due to prescribed pain medication.  In or around 2003, he was involved in a car accident and injured his shoulder.  Doctors prescribed the pain medication Vicodin, which he used in increasing doses to relieve the pain.  Over time, his use developed into an Oxycontin addiction. By 2004, he was using 12 to 15 80 mg. pills a day.  Upon his arrest in 2004, he reported to police that he was addicted to drugs and was stealing money to pay for his habit.  He was committed to state prison.

While in prison, Kelley had significant health problems, including several surgeries.  Doctors prescribed Dilaudid for pain management which he received on and off during a significant part of his custody (he also given methadone from 2009-2011).  Shortly before his release in June 2011, prison authorities ordered that he undergo a rapid detox from Dilaudid and methadone, over a short period of about 3 weeks.  At the time of his release from custody, he was in withdrawal and "dope sick."  He was released from the institution, discharge papers in hand, with no support for his obvious drug dependency.  Within a month of his release, he was using heroin.  On his own, he sought help, in September and October 2011, entering detox programs at CAB Boston, and then at High Point Brockton, but was unsuccessful.  He briefly held employment part-time at Dom's Sausage in Malden.  When arrested for this case, he was using heroin intravenously.

E.  <u>Factors That Warrant A Lower Sentence</u>

The Sentencing Guidelines provide for downward departures where "there exists ... [a] mitigating circumstance ... of a kind or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. §3553(a)(2), should result in a sentence different from that described."  Sentencing Guidelines § 5K2.0 (Policy Statement).

1.  <u>A Departure is Appropriate Due to His Earlier Period of Sobriety</u>

An important prognostic indicator weighing against likely recidivism is defendant's past success for a meaningful period at maintaining sobriety and employment.  Following his release from jail at age 21 and motivated by sadness at his mother's illness, he changed his life.  For over two years, he resisted drug use and held meaningful employment.  These years demonstrate a capability to avoid drugs and lead a productive life.  This effort can be replicated, with greater prospects for success, with the addition of appropriate and rigorous drug treatment. The modules for treatment offer techniques to guard against relapse, with prospects for greater success in the future.

2.  <u>The Manner of the Robberies</u>

Even as note-job-bank-robberies go, these were timid affairs.  Defendant was virtually undisguised, and was twice intimidated into leaving.  His notes were simple: no express

threats of harm.  In contrast to his robbery convictions in 2004 (at age 26), which earned him seven years in state prison, the robberies here (at age 34) relied entirely on teller's compliance with bank policy to simply surrender money.  Without diminishing the seriousness of the current offenses, it is apparent that there is a significant decline in the gravity of the offense from past conduct at a younger age.

As the Court is aware, note jobs are almost always committed by drug addicts and follow a predicable (and unsuccessful) course: a quick payout from a compliant teller followed by certain capture.  These offenses, almost without exception, are committed by addicts who might more productively surrender at the local police station.  It is not to demean the seriousness of the crime to say that perpetrators are, as a group, drug addicted and mere days from capture.

It is also a population which would generally benefit from intensive drug treatment.

    3.   <u>Lost Opportunities in the Massachusetts Penal System</u>

It is a fair point to add that the Massachusetts penal system too lightly dispensed with his need for treatment and rehabilitation.  Relevant here is a study of the Massachusetts prison system, entitled <u>Strengthening Public Safety, Increasing Accountability, and Instituting Fiscal Responsibility in the</u>

<u>Department of Correction</u>, Final Report June 30, 2004.[1]  The report detailed a practice, hardly changed and in full view here, of keeping inmates in high security classifications and then releasing them unprepared to the street:

> Poor utilization of the time of inmates in higher levels of security is particularly problematic in Massachusetts for several reasons.  First, a high proportion of inmates are in high security facilities relative to other states.  Second, large numbers of inmates do not receive post-release supervision.  Third, not enough prisoners are "stepped down" to lower security levels prior to release.  Together, these factors, which are discussed later in the report, mean that the state largely misses the opportunity to reduce the criminal risks of the population behind bars.  The consequences of this are particularly serious for those with the highest risks of re-offending.
>
> A graduated reentry back to the community can help reduce re-offending upon release.  A series of articles on classification and the policy of stepping down to release in Massachusetts found that inmates who moved down through the security levels during their terms of incarceration had lower rates of recidivism than one would have predicted from their risk characteristics.  A recently completed study of federal prison inmates found that inmates placed in a higher level of security had appreciably higher rates of re-arrest (approximately 50%) following release. These results indicate that a strictly punitive approach to corrections has negative public safety consequences.  This study supports the advice of the American Correctional Association to house inmates at the lowest security level consistent with public safety. Common sense and a regard for safety and fiscal prudence support this advice as well. Reentry

---

[1]In 2003, Governor Romney established the Governor's Commission on Corrections Reform to conduct a comprehensive review of the Department of Correction, including issues related to prisoner reentry.  Among other things, it recommended adopting a comprehensive reentry focus, with the Department aiming to "revise its mission to include reducing the rate of re-offense by inmates released into the community."  www.mass.gov/eopss/law-enforce-and-cj/prisons/governors-commission-on-correction-reform.html.

>preparation activities come closest to simulating the types of behaviors that will be required of inmates after release. Because classification policies and procedures are not producing a "step down" in custody level prior to release for most inmates, many go from a highly structured and restrictive environment one day to a completely unstructured, unrestricted environment the next (freedom). This is particularly problematic for those inmates released from higher security levels with no supervision following release. For these inmates, the Department really is the "end of the line" of the criminal justice system, and our last best chance to intervene to help protect the public.

Id.

In view of Kelley's past sobriety, it might have been helpful for the Department of Correction to build on his earlier efforts to ingrain a resistance to further drug abuse, or help him with a half-way house placement or work release.  This was a lost opportunity.  Kelley was released from a secured facility, drug dependent, without any of the opportunities for successful reentry.

   4.   Defendant has significant medical issues

Defendant has significant medical issues, primarily arising from autoimmune kidney disease which has resulted in multiple surgeries with significant complications.  Defendant summarized this history in the presentence report and does not repeat it here.  An additional point merits comment: there was a finding by doctors at Rhode Island Hospital in March 2012 of a hemorrhage in defendant's brain.  This was the possible cause of the seizure he experienced while in custody in Wyatt (as the medical record described it: the "possible seizure focus").  But, this condition

has not been diagnosed further notwithstanding a recommendation to the jail that the jail "follow up with the Neurology Resident Clinic within the next 1-2 months." The "right intraparenchymal hemorrhage," albeit "stable" according to the examining physician in March 2012, has gone unexamined for almost a year.

Overall, it is plain from defendant's history that his future will include frequent and serious medical interventions and procedures to monitor his health. His likely future medical needs would appear to diminish the need for a lengthy sentence here.

F.  The High Costs of Excessive Incarceration

At the inception of the era of guidelines, the Sentencing Commission predicted that the guidelines would "lead to an increase in prison population that computer models, produced by the Commission and the Bureau of Prisons, estimate at approximately 10 percent over a period of ten years." U.S.S.G. Introduction, § 1A1.1, para. 4(g). Instead, the prison population has increased dramatically. The 1986 prison population, federal and state, was 544,972. "At yearend 2010, ... about 1 in every 104 adults [was] in the custody of state or federal prisons or local jails." Lauren E. Glaze, Correctional Populations in the United States, 2010, (December 2011) Http://bjs.ojp.usdoj.gov/content/pub/pdf/cpus10.pdf. A total of 2,266,800 were in custody. Id. According to a report from the

Center for Economic and Policy Research, entitled The High Budgetary Cost of Incarceration, June 2010: "The United States currently incarcerates a higher share of its population than any other country in the world.  The U.S. incarceration rate -- 753 per 100,000 people in 2008 -- is now about 240 percent higher than it was in 1980."

The United States is the world's leading jailer.  Nearly one in four of all prisoners worldwide is incarcerated in America.  For a generation and more, this nation's principal response to crime has been to impose ever-higher sentences.  In turn, inmates learn the skills of "doing time," that is, enduring mind-numbing periods of inactivity with little to occupy their time beyond surviving predatory fellow inmates. In the meantime their social and family networks erode as they are infantalized into prison routine.  They are released years later, nearly 688,000 in 2011, see E. Ann Carson, Ph.D., and William J. Sabol, Prisoners in 2011, Http://bjs.ojp.usdoj.gov/content/pub/pdf/p11.pdf, often unprepared for life on the outside. Some return to custody almost immediately; the effect of long displacement from society is often that prison routine becomes preferable to the stressful uncertainty of reintegrating into a wary workforce while finding a place to live.  For these sorry results, the nation spends an estimated $75 billion a year on "corrections."

There seems to be a developing notion on both sides of the

political aisle, perhaps reflected in a slight drop in the incarceration rate (by .09%), see Carson, supra, that we have lost our way on corrections.[2]  Michael Barone, "Conservatives Backtrack on Long Prison Sentences," Townhall.com, December 9, 2012.  For one, Sen. Rob Portman (R., Ohio), a fiscal conservative, championed the Second Chance Act, which helps states assist recently released prisoners to find jobs, housing, and needed services.  "COMMENTARY: Crazy race to incarcerate," Toledo Blade, October 7, 2012.  This reassessment of corrections has been long in coming.  Almost a decade ago, Supreme Court Justice Anthony M. Kennedy offered a critical view of criminal justice in the United States: "Our resources are misspent, our punishments too severe, our sentences too long."  In his widely reported speech to the American Bar Association on August 9, 2003, Justice Kennedy also noted that, at the time:  "Our incarceration rate in the US, per capita, is about eight times as high as that of England, France or Germany.  Their per capita incarceration rate is about 1 in 1,000.  Ours is one in 143."

The cost, both social and economic, of lengthy prison

---

[2] For example, on December 12, 2012 there was a hearing on Ending the School-Prison-Pipeline Before the Subcommittee on Constitution, Civil Rights, and Human Rights, Senate Committee on the Judiciary. The hearing focused on the impact of overzealous disciplinary action in schools and the potential for these polices to lead students towards later incarceration.  A Congressional hearing on this issue is indicative of the growing concern about mass incarceration across the political spectrum.

sentences is well documented.  A report of the Boston Foundation, for example, notes that in Massachusetts alone the number of people held in state prisons surged by 300 percent, and the number in county jails by about 320 percent, from 1980 to the mid-1990s.  Priorities and Public Safety: Reentry and the Rising Costs of our Corrections System, December 3, 2009, www.tbf.org. Spending on prisons and jails in Massachusetts has surpassed spending on higher education, as of 2003, with investments in corrections crowding out spending on other important priorities. The report of the Center for Economic and Policy Research states:

> We calculate that a reduction by one-half in the incarceration rate of non-violent offenders would lower correctional expenditures by $16.9 billion per year and return the U.S. to about the same incarceration rate we had in 1993 (which was already high by historical standards). The large majority of these savings would accrue to financially squeezed state and local governments, amounting to about one-fourth of their annual corrections budgets.  As a group, state governments could save $7.6 billion, while local governments could save $7.2 billion.  A review of the extensive research on incarceration and crime suggests that these savings could be achieved without any appreciable deterioration in public safety.

See The High Budgetary Cost of Incarceration, supra.

CONCLUSION

For each of these reasons, defendant asks the Court to sentence him to a cumulative term of 60 months custody. Defendant suggests that the pronounced sentence be: 55 months custody, followed by three years of supervised release, the first 5 months in a community treatment facility or drug treatment facility as appropriate. Such a sentence would ensure that Kelley is released only after a reentry period with appropriate supportive services. Such a period is not otherwise assured in a committed sentence, and is precisely the factor which might have proven so beneficial in the past.

                                      KENNETH KELLEY
                                      By his attorney,

                                      /s/ Charles P. McGinty

                                      Charles P. McGinty
                                        B.B.O. #333480
                                      Federal Defender Office
                                      51 Sleeper Street, 5th Floor
                                      Boston, MA  02210
                                      Tel: 617-223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 9, 2013.

                                      /s/ Charles P. McGinty

                                      Charles P. McGinty